

## Fourth Court of Appeals
### San Antonio, Texas

### OPINION

No. 04-22-00264-CV

**IN THE INTEREST OF E.J.M.**, a/k/a E.J.D.L.G., a Child

From the 150th Judicial District Court, Bexar County, Texas
Trial Court No. 2020PA01970
Honorable Monique Diaz, Judge Presiding

**OPINION ON MOTION FOR EN BANC RECONSIDERATION**

Opinion by:    Lori I. Valenzuela, Justice

Sitting en banc:    Rebeca C. Martinez, Chief Justice[1]
                Patricia O. Alvarez, Justice
                Luz Elena D. Chapa, Justice
                Irene Rios, Justice
                Beth Watkins, Justice
                Liza A. Rodriguez, Justice
                Lori I. Valenzuela, Justice

Delivered and Filed: May 31, 2023

AFFIRMED

In an opinion and judgment dated October 26, 2022, the panel affirmed in part and reversed in part the trial court's order terminating the parental rights of appellant, J.A.M., and remanded the cause in part. The appellees/intervenors and the ad litem filed motions for reconsideration en banc, which a majority of this court grants. We withdraw our opinion and judgment of October 26, 2022 and issue this opinion and judgment in their place.

---

[1] Not participating.

After a multi-day jury trial, at which several witnesses testified, the trial court signed a Final Order in Suit Affecting the Parent-Child Relationship and Order of Termination (the "termination order") terminating J.A.M.'s parental rights to his daughter, E.J.M.,[2] and naming the child's foster parents (J.B. and E.B.) as E.J.M.'s joint managing conservators. The termination order removed the Department of Family and Protective Services (the "Department") as managing and/or possessory conservator and released the Department from any further duties, responsibilities, or authority. We affirm.

**STANDARD OF REVIEW**

To terminate parental rights pursuant to Family Code section 161.001, the Department has the burden to prove by clear and convincing evidence: (1) one of the predicate grounds in subsection 161.001(b)(1); and (2) that termination is in the best interest of the child. *See* TEX. FAM. CODE §§ 161.001(b), 161.206(a). In this case, the jury found evidence of one predicate ground to terminate J.A.M.'s parental rights, specifically section 161.001(b)(1) subsection (E).[3] The jury also found termination of his parental rights was in E.J.M.'s best interest. J.A.M. filed an appeal in which he challenges the legal and factual sufficiency of the evidence to support (1) the predicate finding that he engaged in conduct or knowingly placed the child with persons who engaged in conduct that endangered the physical or emotional well-being of the child and (2) the finding that termination of his parental rights was in the child's best interest.

When reviewing the sufficiency of the evidence, we apply the well-established standards of review. *See* TEX. FAM. CODE §§ 101.007, 161.206(a); *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex.

---

[2] To protect the privacy of minor children, we use initials or an alias to refer to the children, their biological parents, and the foster parents. TEX. FAM. CODE § 109.002(d); TEX. R. APP. P. 9.8(b)(2). E.J.M. a/k/a E.J.D.L.G., was born on September 14, 2020.

[3] "The court may order termination of the parent-child relationship if the court finds by clear and convincing evidence . . . that the parent has[] engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child . . .." TEX. FAM. CODE § 161.001(b)(1)(E).

2006) (per curiam) (factual sufficiency); *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (per curiam) (legal sufficiency). The trier of fact is the sole judge of the credibility of witnesses and the weight to be given their testimony. *J.P.B.*, 180 S.W.3d at 573. We therefore defer to the fact-finder regarding credibility determinations.

To determine whether the evidence is legally sufficient in parental termination cases, we look at all the evidence in the light most favorable to the trial court's finding to determine whether a reasonable factfinder could form a firm belief or conviction that the finding is true. *In re Z.N.*, 602 S.W.3d 541, 545 (Tex. 2020). The factfinder may draw inferences, but they must be reasonable and logical. *Id.* We assume the factfinder settled any evidentiary conflicts in favor of its finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved, and we consider undisputed evidence even if it is contrary to the finding. *Id.*; *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). That is, we consider evidence favorable to the finding if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *J.P.B.*, 180 S.W.3d at 573. The factfinder is the sole judge of the witnesses' credibility and demeanor. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

With regard to a factual-sufficiency challenge to the termination grounds, we must perform "an exacting review of the entire record." *See In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). We nevertheless give due deference to the factfinder's findings and do not supplant the judgment with our own. *H.R.M.*, 209 S.W.3d at 108. As pertinent here, we review the whole record to decide whether a factfinder could reasonably form a firm conviction or belief that the Department proved J.A.M. endangered E.J.M. and termination of J.A.M.'s parental rights was in E.J.M.'s best interest. *See* TEX. FAM. CODE § 161.001(b)(1)(E); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If the factfinder reasonably could form such a firm conviction or belief, then the evidence is factually

sufficient. *C.H.*, 89 S.W.3d at 18-19. But if a factfinder reasonably could not—because the disputed evidence that could not reasonably support the finding is too significant—then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

While we must detail the evidence relevant to the issue of parental termination when reversing a finding based upon insufficient evidence, we need not do so when affirming a verdict of termination. *A.B.*, 437 S.W.3d at 503.

## BACKGROUND

Trial commenced on March 22, 2022. The jury returned its verdict on April 1, 2022.

**A.    Doctor's and Therapist's Testimony**

The Department called one witness to testify about E.J.M.'s heart-related medical issues and another witness to testify about J.A.M.'s counseling.

**1.  Dr. David Bush**

Dr. Bush, a practicing pediatric cardiologist, testified E.J.M.'s pediatrician referred E.J.M. to his practice on September 27, 2021, because she was having difficulty swallowing, as well as having a history of breathing difficulty. Tests revealed E.J.M. had a "vascular ring," which is a blood vessel or other structure that acts as a brace around the airway and the feeding tube in the chest, compressing them.[4] E.J.M. underwent surgery on October 8, 2021, to open up the vascular ring. Bush said the surgery was successful and E.J.M. was discharged three days later. On December 17, 2021, he saw E.J.M. for an evaluation because there were poor growth concerns. He concluded her growth was normal. Bush stated the foster mother accompanied E.J.M. for her first follow-up appointment on September 27th and for the next appointment in October. The foster sister, without either foster parent, accompanied E.J.M. for the December 17th appointment.

---

[4] Genetic tests did not indicate the reason for E.J.M.'s heart abnormality.

He has never met or spoken to either E.J.M.'s mother ("Luisa") or J.A.M. Bush did not know whether J.A.M. was informed of the surgery or appointments.

## 2. Sue Jurecko

Jurecko is a licensed mental health counselor who works with the Department, which referred J.A.M. to her. Jurecko first met J.A.M. in December 2020 to address drug use, domestic violence, remaining a law-abiding citizen, prioritizing the needs of E.J.M., and completing his service plan. She said J.A.M. understood the Department's concerns at the time of E.J.M.'s removal, he fully cooperated with counseling, and he never missed a session with her from December 2020 to the present. She said she spoke with J.A.M. two or three times a month. Before discharging a client, she said she considers the client's level of participation and motivation in completing all required services; whether the client has completed all their services and been compliant with the Department; whether they are compliant if they are on probation; and how they engage in counseling. She said J.A.M. "engaged very well," and she believed she could successfully discharge him from therapy. She explained that she could have discharged J.A.M. sooner but chose not to do so because

> [f]or all intents and purposes, he's completed everything. My office will be closing as of the 28th. And I wanted to continue with him until the very end so I would know [the] outcome of [the] situation. I was still dealing with him and talking to him because of some of – him experiencing some anxiety regarding the case, in regarding what had happened. CPS was ready to reunite, and then this lawsuit came up [when the foster parents filed suit]. And so I've continued with him.

> I could have discharged him maybe after – generally, I'll keep clients for eight months to a year, but I didn't. I chose to continue because of the recent happening [sic] of this issue with [E.J.M.], whether or not he's going to reunite with her.

Jurecko stated J.A.M. admitted to his use of methamphetamine, he completed his drug treatment, and he has been drug-free since December 2020.[5] She also addressed concerns about domestic violence with J.A.M. with regard to his relationship with Luisa and "some other issues in previous relationships." She said J.A.M. has had no contact with Luisa, he is not in any other romantic relationship, and his focus is on E.J.M. Regarding J.A.M.'s criminal history, they discussed the charges and convictions, remaining in compliance with probation, and the importance of being a law-abiding citizen. She believed J.A.M. was in compliance with his probation and had taken the appropriate steps to being and remaining a law-abiding citizen. When asked what J.A.M. told her about his desire to put his criminal past behind him, Jurecko responded:

> That's – that is in the past. That's what happened then. It's not now. He's focused on the present now and doing what he needs to do, completing goals in order to be reunified with him [sic] daughter. He was angry as a teen. During childhood, he lacked having a father. He got in with the wrong crowd. And he's aware he made some poor decisions, and he is making better decisions now.

Regarding J.A.M.'s prioritizing E.J.M.'s needs, Jurecko said,

> [h]e had been involved – I think there was prior involvement with the Department, and he lost two daughters. His rights were terminated because he didn't show up for court. And when this case opened, in his heart of hearts, he did not want to lose [E.J.M.]. So he stepped up. He stepped up to the plate.

She said J.A.M. is older now and more mature, he takes responsibility for his criminal past, and "when this case opened, he – a light went off, and he instantly made the decision to turn around his life. And I believe he has." She did not have any concerns that J.A.M. could appropriately care for and protect E.J.M. She described his level of compliance and engagement as "[e]xceptionally good," and he was "one of the few clients [who were] very attentive." She had no concerns about reuniting J.A.M. and E.J.M. She said J.A.M. had a very good family support network.

---

[5] She said J.A.M. admitted using marijuana beginning at age eighteen and stopping eleven years ago; he began using methamphetamine in 2013 and stopped in September 2020; he started using cocaine at age twenty and stopped seven to nine years ago.

**B.       J.A.M.'s Probation Officer**

Laura Torres testified she has been with the Bexar County Adult Probation Office gang unit for about three years.  J.A.M. was placed on probation in November 2021 and she received his case on December 28, 2021.  She said J.A.M. is on her caseload because when an individual is granted probation, they are run through a check with TXGANG, which is operated by the Texas Department of Public Safety, and if the individual is classified or tagged as a gang member, that individual is assigned to her unit.  Torres said she could not say whether J.A.M. was involved in gang activity while incarcerated, she could only state that he was tagged in the TXGANG system as a gang member on October 27, 2021; the tag lasts until 2025; and the tag will not be renewed if he does not re-engage in gang activity.  She explained that "tagged" is when an individual is classified in prison, "that means that he is actually a documented gang member. He's tagged as a documented gang member."  She said J.A.M. was participating in a gang diversion program for the purpose of showing he was no longer associated with a gang.

Torres said J.A.M. was in the same gang before he went to prison and she explained the background of the gang as follows:

> There's a long story behind that. But it actually started as a protective group within TDCJ walls. It actually filters down from the . . . that started up in the bigger cities like Dallas and Fort Worth and Austin. Now there are local chapters. They are mainly based in the prison system. But as time has gone on, they've actually spilled out into the streets. Some of the gang members are still active out in the street, and others are just only active within the prison system when they're actually locked up.

She stated she had no concerns that would lead her to believe he was still associated with a gang and she saw no signs of current gang membership.  She stated J.A.M. had gang tattoos and he admitted to her he was a member of a gang while incarcerated.  Regarding getting out of a gang, Torres testified as follows:

The whole purpose of the gang diversion program is to be able to rehabilitate and change behaviors of the individual. At that point, [J.A.M.] has – he's shown that he has made some changes. As far as leaving the gang, there's always a possibility of a person to slide back or into the gang. So once a person is involved in a gang in the prison system, then you're let out. At that point, you have the opportunity to slide out, in the history of the people that I've worked with. But they also have the opportunity to always fall back into it depending on associations.

At that point, what I'm looking at is who he's around, who he's – who [sic] his environment is, what he's doing, if he's working. I'm looking at positive drug tests. At that point, those are indicators for me to follow-up to closely look at my defendant.

When asked whether, based on her training and experience, she had any reason to doubt that J.A.M. was no longer involved in gang activity, she replied, "I believe and I have . . . seen so far that he is not involved in any type of gang activity." She said being "jumped out," which she explained as being assaulted by other gang members, is not the only way to leave a gang. She did not know whether J.A.M. had been "jumped out." However, she opined it was possible to be in a gang while incarcerated but not be in a gang upon release.

Torres said she has made two field visits with J.A.M., once at his sister's house and another time at his place of employment. Torres was not aware that J.A.M. sometimes stayed with his mother, but she was not concerned. She said she told J.A.M. he should notify her within twenty-four hours of any change in residence, but as long as his stay was for not more than three or four days, it was permissible for him to stay with other family members. She said he was a compliant probationer, he was responsive, she had no concerns about drug use, and she had confirmed his employment with a company where he works rebuilding cabinets. She said J.A.M. was "very motivated to maintain compliance" and he was motivated by his children. She had "no doubt" that he wanted to "stay on the straight and narrow."

She agreed J.A.M. had been given many chances and he has been twice placed on probation (in 2013 and 2020).[6] She was not aware of the allegation that J.A.M.'s mother's boyfriend was a felon and she agreed that associating with other felons would violate the terms of his probation. However, she said "associating" was determined on a case-by-case basis. She explained she would supervise J.A.M. for twelve months and, if she saw no further signs of gang affiliation, he would be released to regular supervision. She said for the next five years of his probation, J.A.M. would be sent back to custody if he violated the terms of his probation. Torres said it appeared J.A.M. had spent more than eighteen months in prison.

## C. The Department's Caseworkers

Two caseworkers testified at trial.

### 1. The first caseworker

Rachel Kotowski,[7] the first Department caseworker on this case, testified she received the case after the removal hearing on September 24, 2020, and she worked the case until January 26, 2022. She stated the case started on September 15, 2020, due to allegations that E.J.M. tested positive at birth for illegal substances. Luisa also tested positive.[8] At this time, Luisa did not provide any information about J.A.M., but Kotowski later learned about J.A.M. and that J.A.M. was living at his mother's house. Kotowski stated J.A.M. knew Luisa was pregnant and the child

---

[6] The trial court admitted into evidence the judgments on the following offenses: a January 25, 2010, burglary of a habitation with force; an August 14, 2010, burglary of a habitation with force; an August 28, 2013, evading arrest/detention with a vehicle; and a November 8, 2019, possession with intent to distribute. Torres testified J.A.M. was given probation in all four cases. On September 25, 2013, judgments in the first three convictions were signed and the sentences ran concurrently. The November 8, 2021, judgment in the fourth case indicates J.A.M.'s sentence was suspended and he was placed on community supervision.

[7] She is later called as a rebuttal witness and her last name, in that reporter's record, is spelled Patowski. When she is first called to testify, she was asked to spell her name and she spelled it Kotowski. In this opinion, she will be referred to as Kotowski.

[8] Luisa had several other children, three of whom have been adopted and three of whom are living with family members. J.A.M. was not the biological father of these other children.

was his. When she spoke to J.A.M. about the Department's allegations against Luisa, he said he believed the allegations were true, he was concerned about E.J.M., and he wanted to see the child. J.A.M. admitted to Kotowski that he had used drugs in the past but currently was not doing so.

After removal, in mid-September 2020, E.J.M. was placed with foster parents, J.B. and E.B. (collectively, "foster parents"). Kotowski said the Department was familiar with the foster parents because they had previously cared for and adopted two of Luisa's other children and they had been involved with the Department for about six years. J.B. and E.B. were not a licensed foster home at the time but have since become licensed.

Kotowski said that because the Department's goal is to reunify families, the Department conducted a home study on J.A.M.'s sister ("Jennifer") in either June or July of 2021. Kotowski said Jennifer had enough space in her home that J.A.M. and E.J.M. could each have their own room. Kotowski had no concerns about Jennifer's home and she thought E.J.M. was very comfortable with her aunt and uncle. Although no home study was done on the paternal grandmother's home, Kotowski said she did not have any concerns about the home except there was not enough space for E.J.M. and J.A.M. to reside with his mother.

Kotowski created a service plan for J.A.M., which required psychological evaluation and individual counseling, a drug assessment and subsequent drug treatment, domestic violence classes, parenting classes, and random drug testing. He was also required to show he could provide for the basic physical and emotional needs of E.J.M. J.A.M. completed all the services required of him[9] and he had addressed the concerns the Department had at the inception of the case. Kotowski said J.A.M. "engaged in everything and successfully completed all that he'd [sic] asked

---

[9] He completed his drug treatment on January 6, 2021. He completed his psychological on November 4, 2020. He started individual counseling with Sue Jurecko on December 10, 2020. He completed parenting and domestic violence classes in the summer of 2021.

us to and was willing to complete anything else he needed to." Kotowski was aware J.A.M. was placed on probation in early November 2021 for an offense committed in September 2020, prior to E.J.M.'s birth. Kotowski also knew J.A.M. was arrested for manufacturing and distributing narcotics in 2020. As far as she knew, he was in compliance with the requirements of his probation.

Kotowski observed J.A.M.'s visits with E.J.M. and, according to her, he "really loved" E.J.M.; he tried to care for her every need; whenever she was upset, he would check all the basics such as her diaper and whether she was hungry; and he would walk her around and do everything he could to soothe her. He also brought E.J.M. food, gifts, and toys. Kotowski believed father and daughter were bonded. Initially, J.A.M. was allowed once-a-week supervised visits. In September 2021, he was allowed unsupervised weekend visits.

In October 2021, E.J.M. had surgery and J.A.M. was present at the hospital for the duration of the surgery. She said that, according to J.A.M., the hospital allowed only the foster parents to be with E.J.M. after the surgery due to Covid-related concerns. On cross-examination, Kotowski said she was not aware of the allegation that he told the doctors the foster parents "were going to take care of it and left." She also was not aware of the allegation that the child's doctor said he had never spoken to J.A.M.

Kotowski said that when J.A.M. was given enough notice, he asked to attend E.J.M.'s doctor appointments, and he went to one or two, but not all, appointments. Again because of Covid-related concerns, only the foster parents were allowed to attend. Kotowski stated E.J.M. has some developmental concerns and she participated in speech therapy, occupational therapy, physical therapy, and feeding therapy. Kotowski said J.A.M. took E.J.M. to the doctor after their visit in December 2021 because he wanted to speak with the doctor himself without the foster

parents present. She said he wanted to learn about E.J.M.'s needs because he wanted to be aware of everything and get more involved in her treatment.

Although the case began as a termination case, the Department's objective changed to reunification based on J.A.M.'s progress. Kotowski said she believed J.A.M. had made the necessary changes the Department wanted for reunification; she believed he could take care of E.J.M.'s physical and emotional needs; and she had no concerns about his ability to care for E.J.M. She said the Department took J.A.M. being on probation into consideration and she did not believe this prevented J.A.M. from caring for E.J.M. She stated J.A.M. understood the importance of keeping E.J.M. safe and out of an environment that would cause her harm, including being around Luisa. Kotowski believed terminating Luisa's parental rights and naming J.A.M. as managing conservator was in E.J.M.'s best interest. Kotowski testified that Luisa said she had seen the changes in J.A.M., she wanted E.J.M. to grow up with her father, and she believed J.A.M. was the best caregiver for their daughter. The Department was ready to place E.J.M. with J.A.M. in August 2021.[10]

Kotowski said J.A.M. was not comfortable contacting the foster parents because he was worried "that things would be used against him or that they would – twist his words against him." She agreed the foster parents attended "a majority" of E.J.M.'s doctor visits. Kotowski did not know whether J.A.M. provided any financial support, but she said no child support had been ordered. The foster parents' attorney then asked Kotowski several questions regarding J.A.M.'s criminal past:

> Q. Did – when I asked you in the December 16th, 2021, hearing, the one in front of Judge Susan Reed [on the Department's motion to place], when I had asked you if you knew [J.A.M.] had been on – in gang activity, do you recall your response?
> A. I recall that I knew he was previously engaged in gang activity.

---

[10] The foster parents filed their intervention on July 19, 2021. On November 18, 2021, the Department filed a motion to place E.J.M. with J.A.M. Following a hearing, the motion to place was denied on December 22, 2021.

Q. When I asked you if he was currently a member of a gang, what did you say?
A. No.
Q. And then when I asked you if you had investigated whether he was in a gang, what was your answer?
A. I believe I had stated I discussed this with [J.A.M.], but I did not do any further investigation.
Q. Were you aware that [J.A.M.] had pleaded guilty to . . . manufacturing and distribution of a controlled substance, namely, methamphetamines less than three weeks prior – five weeks prior on November 8th, 2021, in front of Judge Meza?
A. I wasn't aware of this. This was a specific charge, but I did know that he had pled guilty to the criminal charge that was pending.
Q. So you didn't investigate when you – when you testified to the jury that you were aware of his criminal history, are you telling this jury you have no time to look up his criminal history?
A. I did look at it. I wasn't aware that was the specific charge in that language.
. . .
Q. Okay. Are you familiar with his probation? Have you ever talked to Laura Torres?
A. Yes. I've talked to both of his probation officers.
Q. And what is Laura's job?
A. Laura's job is to ensure that he's complying with probation and maintaining a drug-free lifestyle, maintaining employment, appropriate housing, and complying with any other specifics of the probation order.
. . .
Q. So you were never informed that he is in a specialized probation unit specifically for gangs?
A. No.
Q. And so since this is not part of your knowledge, none of this would have been considered in your evaluation for today; correct?
A. Yes. Sorry. Can you rephrase that question?
Q. I said, since none of this was within your knowledge, then it could not have been part of your consideration for today; correct?
A. Because I didn't know about this specifically, but it doesn't impact my position.

Kotowski was later able to clarify that the therapist who saw J.A.M., Sue Jurecko, was worried about gang activities only when J.A.M. was a teenager and she had no concerns about any current gang activity now that J.A.M. was thirty-one years old. Kotowski was aware J.A.M. had been on probation once before, but she could not recall the offense, which she acknowledged occurred in 2020.

She agreed J.A.M. had more than one residence over the past eighteen months, moving between his mother's house and his sister's house. When asked about his house arrest, Kotowski

stated, "[f]or most of the time, he was residing with his mother except for that short period between July 2021 and August 2021 when we recommended he be with his sister to be reunified with [E.J.M.]. His residence was with his sister. But then he did go back to his mother's, and he was still on house arrest at that time."

Kotowski was aware J.A.M. had been arrested for family violence against Luisa shortly before E.J.M.'s birth. Kotowski was asked whether it would surprise her that J.A.M. had told another judge on November 8, 2021, that he had custody of two of his children. Kotowski said she was not aware of the allegation, but she agreed that the statement—if made by J.A.M.—was not true. However, she later clarified that J.A.M. has an eleven-year-old daughter whom he supports.

On redirect examination, Kotowski stated the foster parents receive monetary compensation for caring for E.J.M. When asked whether she had any concerns about J.A.M. being truthful while she had the case, she replied, "I – as I stated earlier I was a bit weary at first just based on his history; however, I found everything he told me to be truthful. And everything that he told me lined up with what I had been told by his service providers and by his family." She said the fact that J.A.M. resided with different family members did not indicate he lacked stability because the only time he moved in with his sister was when the Department recommended that he do so for the purpose of being reunited with E.J.M. According to Kotowski, if E.J.M. is placed with him, J.A.M.'s plan was to stay with his sister until he has saved enough money to get a place of his own.

She said that after his house arrest ended and J.A.M. was placed on probation, in November 2021, he immediately obtained full-time employment and she received proof of employment. She had no concerns about J.A.M.'s ability to financially support E.J.M. because he "has done

everything he can to financially support her. And once he did gain employment, he was more than willing to get everything that she needed and was – did provide for all of her needs."

## 2. The second caseworker

Crystal Jones took over as caseworker after Kotowski left the Department. She said Luisa wanted to relinquish her parental rights and "give them over to" J.A.M. She confirmed that J.A.M. was named as the father on E.J.M.'s birth certificate; he remains in compliance with his family service plan;[11] he continues to cooperate with the Department; he is still employed and in compliance with his probation; and he continues to visit with E.J.M., including overnight visits. She had no concerns about the visits or his staying overnight at his mother's house. She said J.A.M. had demonstrated he was able to care for E.J.M. and was committed to her. Jones recommended naming him as E.J.M.'s managing conservator, which she believed was in E.J.M.'s best interest, and she did not believe that doing so would impair E.J.M.'s physical health or emotional development. She said J.A.M. had addressed all of the Department's concerns, he had completed his services, and he was able to demonstrate or articulate what he has learned from his services "in regards to his daily life and with his visits with" E.J.M. She said the Department wanted to place E.J.M. with J.A.M. in November 2021. Since she was assigned the case in 2020, she has visited the apartment of J.A.M.'s mother once and his sister's home once. When she visited the paternal grandmother's home, J.A.M. was there with E.J.M. and E.J.M. was comfortable and familiar with her grandmother. She said J.A.M. continued to have weekly visits with E.J.M. and she had no concerns about the child losing weight.

She said E.J.M. was doing well with the foster parents, but she believed J.A.M. could take care of all the child's needs. She also agreed the foster parents provided a stable environment for

---

[11] She also testified that the program offered by J.A.M.'s probation officer addressed concerns about past gang affiliation.

E.J.M.; they have no criminal history or past history with the Department other than foster care and adoption of children; they both have stable employment; and they have successfully raised children of their own.

Jones was aware, when she took over the case, that the foster parents were under investigation by the Department regarding E.J.M.'s weight and an allegation that they failed to give J.A.M. instructions regarding the child's protein allergies. She was aware of the allegation that E.J.M. suffered a weight loss after a visit with J.A.M. The foster parents were the ones who complained about the weight loss and both the foster parents and J.A.M. took E.J.M. to the doctor. Jones said the foster parents were the ones who alleged E.J.M. lost ten percent of her body weight and J.A.M. was investigated based on the allegation. The allegations against the foster parents were later ruled out and the child was diagnosed as not having a milk or protein allergy. A specialist confirmed the ten percent weight loss was inaccurate and that E.J.M. was well-nourished. J.A.M. was also ruled out and the reported weight loss was determined not to be actual weight loss.

Jones stated E.J.M. was receiving various forms of therapy, all paid for by Medicaid. She believed J.A.M. would continue with E.J.M.'s therapy if the child was returned to him. When asked about the programs available to meet E.J.M.'s on-going needs, she stated:

> A. And so if Early Childhood Intervention [which ends at age three] determine[s] that [E.J.M.] still needs the services, they usually make a referral or make recommendations for him to seek assistance through another program that will help her get the therapies that she needs. And there are programs that will take the insurance, private pay, Medicaid for her to continue those needs.
> Q. But then what if the Department is out of the picture? There's no guarantees that [J.A.M.] might follow-up and do it or not do it; is that correct?
> A. Correct.

She had no concerns about J.A.M.'s mother or sister, and she agreed that having a support system with family members was "a good thing."

**D.    J.A.M.'s Testimony**

J.A.M. testified he has four children (including E.J.M. who is the youngest), and his parental rights to the two children older than E.J.M. have been terminated based on his drug use. When he is employed, he pays child support for the oldest child ("Angelina," an eleven-year-old daughter), and he admits he is in arrears for "a big amount." He was with Angelina's mother for about four years and he cared for Angelina while her mother was at work. A grandmother has custody of his two other children (also daughters) to whom his parental rights were terminated and he stays in contact with the grandmother and will attend birthday parties and other family outings.

He said he met Luisa shortly before she became pregnant with E.J.M. On the day E.J.M. was born, Luisa did not contact him, but the hospital did. By the time he got to the hospital, he was not able to see his daughter because the foster parents had already taken her. Prior to the 2019 drug charge, the last time he was charged with an offense was in 2013. On September 4 or 5, 2020, a few days before E.J.M.'s birth, J.A.M. was charged with assaulting Luisa but the charge was dismissed based on insufficient evidence after he pled guilty to the drug offense. J.A.M. admitted to being arrested twice in the month E.J.M. was born. In the first instance, he was in jail for about a week because his bond on a drug (methamphetamines) charge was increased following the assault charge. In the second instance, the bond was increased because he was charged with another drug offense in mid-January 2020 while out on bond. He was released from jail on the assault charge in September 2020 and placed on house arrest for about one year during which time he took online classes as part of his service plan.

He admitted to joining a gang when he was "young" and in jail because he thought he needed to do so for protection. He has had no contact with any members of the gang since his release from jail, he has not been required to do anything for the gang, and he has not engaged in criminal activity at their request. He said his 2019 arrest for manufacturing and distributing

methamphetamine was his "choice [and] not because of gang affiliation." He reports every month for his probation and is drug tested twice a month. He cannot see E.J.M. on the weekends he performs his community service, which he said should end in another two weeks.

J.A.M. agreed having four felonies on his record was "a lot," but he said he did not intend to reoffend because he was "tired of going through the system," "it's getting old" to him, and he realized he needed to take responsibility and gain stability. He wanted to do this for his daughters and his mother. He said he had learned from his services and he was a different person today than he was eighteen months ago because he was not an angry person, he was more motivated, and he stopped taking drugs. When he was not working, he spent time with his family and he considered them to be a positive support system for him. However, he acknowledged this was the same familial support system he had when he was committing crimes. None of his siblings have a criminal record or a history with the Department. He said the foster parents requested he take a drug test shortly before trial began, which he did, and the result was negative. The test was a nail follicle test, which can identify drugs in a person's system up the three months in the past.

J.A.M. believed he could take care of E.J.M.'s needs and they were bonded to each other. He said E.J.M. is happy when she is in his care and she comes to him for comfort when someone new comes to the house. If she is returned to him, they would reside with his sister and her husband, and he would place E.J.M. in daycare when he was at work. He said E.J.M. and his sister are "real close" and his sister loves E.J.M. like her own daughter. He likes his current job at which he works ten hours a day, Monday through Friday, and every other Saturday. He believed he could financially support E.J.M.[12] At the moment, he does not have transportation of his own and he uses his mother's car to drive to work. Currently, he lives with his mother, but he stays at his

---

[12] He started his current job in December 2020, about two weeks after he was placed on probation. Prior to this job, the last time J.A.M. was employed was in 2019.

sister's home when he has E.J.M. because she has a spare bedroom where he keeps a crib for E.J.M. In addition to his classes, he said he understood he also had to make behavioral changes, which include "staying clean," maintaining a job, and complying with the terms of his probation. In November, the Department intended to return E.J.M. to J.A.M. for a "monitored return," but a visiting judge [Judge Reed] refused to allow that to happen. He said he wanted to be appointed E.J.M.'s sole managing conservator, but if E.J.M. is not returned to him, he wanted to be appointed possessory conservator. He did not want his parental rights terminated.

J.A.M. acknowledged he has been on probation since only November and he violated his last probation. He agreed that during his house arrest he could not reoffend, and now that he was no longer on house arrest, he said he would not reoffend because he was "just tired of going through the system," he was now trying to be a father to his daughters, and he had "just stopped being selfish."

Most of the time when he has E.J.M., J.A.M. stayed with his mother. His mother's house has one bedroom, and her boyfriend also lives in the house. When he is at his mother's house, J.A.M. sleeps on a mattress and E.J.M. also sleeps on a mattress low to the floor to ensure she does not fall off and hurt herself. He acknowledged the terms of his probation require him to let the probation office know if he was going to stay somewhere other than his sister's home for more than three days and the address of the place he would stay. He also acknowledged the probation office did not know his mother's address.

Although he could not name specific daycare centers, schools, doctors, or therapists, J.A.M. stated he would research this information and place E.J.M. with the appropriate people. He admitted he had not spoken to E.J.M.'s doctors or therapists, and he had not spoken to the foster mother about the child's medical care.

He has communicated with E.J.M. via Zoom three times. When asked why he did not do so more often, he replied, "I just really sometimes don't feel comfortable with, you know – I know sometimes they [the foster parents] twist up my words a little bit, you know, and try to go to the Department and say, you know, I said this or something like that." He was not aware the foster parents had hired a private investigator to follow him.[13]

J.A.M. said he did not have a relationship with Luisa because he wanted to change himself. He admitted he and Luisa procured and used methamphetamines together, but he denied getting her addicted or giving her any drugs. At the time they took methamphetamine together, he knew Luisa was pregnant with E.J.M. He said the hotel where he had distributed drugs and where Luisa lives is about six minutes from his house. When asked how he anticipated staying away from the location, he responded, "Just don't go."

## E. The Foster Parents' Testimony

E.J.M.'s foster mother (E.B.) and foster father (J.B.) testified.

### 1. The foster mother

E.B. testified she has known Luisa for about five years and Luisa rents one of her apartments. E.B. and her husband have adopted two of Luisa's other children, the first child about three years ago. E.B. was present at E.J.M.'s birth because Luisa called her to say she thought she was in labor and needed E.B. to take her to the hospital. E.B. said Luisa told her, before E.J.M.'s birth, that she did not want the baby and she asked E.B. if she "wanted another baby." E.B. said

---

[13] Two private investigators testified they were retained by the foster father to confirm where J.A.M. was residing and where he went when he left the house. One of the investigators stated the foster father wanted to know if J.A.M. lived at his mother's apartment, what time he left, and what time he returned. J.A.M.'s movements were watched for about one week. During this time, J.A.M. was observed leaving for work every day at the same time and no criminal activity was observed.

E.J.M. had tremors when she was born. E.B. knew Luisa used methamphetamine and marijuana, and that her parental rights to the other children had been terminated based on her drug use.

E.B. said she and her husband recently obtained their license as foster parents because the Department advised that they do so for the purpose of fostering E.J.M., she admitted they receive a stipend from the State to care for E.J.M., and she acknowledged that E.J.M.'s medical and therapy expenses were covered by the State. She said she decided to intervene in the case because E.J.M. "is my child," "I feel that she is our child," and "I want her to stay with her siblings." She was concerned about J.A.M.'s ability to care for E.J.M. and her needs. She did not believe J.AM. was stable because he moved from one house to another, he only saw E.J.M. about twenty-four hours a week, and the person watching E.J.M. was J.A.M.'s mother. However, she admitted she never saw anything with J.A.M. or his family that caused her concern. She also admitted that J.A.M. saw E.J.M. for only twenty-four hours a week because she and her husband fought against him having more access. She said that although J.A.M. has the telephone numbers to doctors and therapists and is able to attend appointments, he does not call or attend.

She conceded she scheduled E.J.M.'s doctor's appointments and therapy sessions when they were available and to fit her own schedule. She did not call J.A.M. to inquire about his work schedule and she admitted J.A.M. was at a disadvantage as far as attending the appointments. She said her husband sends an email once a week to all the attorneys, J.A.M., and the Department with all of E.J.M.'s appointments.

When asked whether she thought appointing J.A.M. as E.J.M's managing conservator would significantly impair E.J.M.'s physical health or emotional development, she responded:

> At this point, he knows nothing about [E.J.M.] but what you told him. He has not participated in anything with her doctor's appointments, with her physical therapy, with her speech. When [E.J.M.] was at the hospital, when she had heart surgery, what was testified is not what happened.

He was given the choice to stay, he chose my husband to stay there. He was given the choice who is going to stay there, and he chose not to stay there. My husband would have given up his spot so that [J.A.M.] could stay there with me to be with [E.J.M.].

She stated E.J.M. is still going to a gastroenterologist, and she did not believe J.A.M. could follow a doctor's instructions for E.J.M.'s medical care because he has only attended one doctor's appointment.

E.B. believed termination of J.A.M.'s parental rights was in E.J.M.'s best interest because she did not believe he had protected her, Luisa told her J.A.M. did not want the baby, he was not capable of supporting E.J.M., he never called her to ask if she (E.B.) needed anything, and he had not participated in any decisions regarding E.J.M.'s daycare. She was concerned about J.A.M. caring for E.J.M. in the absence of his family because he had never done so without the family's presence. She said she had spoken to J.A.M. about caring for E.J.M. and she did not believe he understood the severity of E.J.M.'s needs or the amount of work involved in caring for her. If she and her husband are able to adopt E.J.M., they would pay for her daycare at the same place she currently attends. E.J.M.'s two half-siblings attend the same school and the children are all close to one another. She and her husband have eight children and live in a three bedroom, three bath 2,600-square-foot house on five acres of land. All the children who still live at home have their own bed.

She thought E.J.M. had attended about eighty-eight medical and therapy appointments. J.A.M. attended one of the appointments. From January 2021 through March 2022, J.A.M. attended one appointment in October 2021 and one appointment in December 2021.[14] A typical

_____

[14] E.J.M. had the following number of scheduled medical or therapy appointments: three in January 2021; zero in February 2021; five in March 2021; four in April 2021; seven in May 2021; six in June 2021; four in July 2021; five in August 2021; seven in September 2021; eight in October 2021; five in November 2021; eleven in December 2021; seven in January 2022; nine in February 2022; and seven in March 2022. Some of these appointments were for therapy and took place at E.J.M.'s daycare.

week involved two visits with E.J.M.'s speech therapist one hour away in Floresville and physical and occupational therapy at either her house or at E.J.M.'s daycare. E.J.M. also had multiple doctors' appointments depending on what her needs were at the time. She said E.J.M. had no known allergies. According to E.B., E.J.M. had a few problems after returning from J.A.M.'s care, such as diarrhea, diaper rash, weight loss, and ringworms. She said E.J.M. cries when she is dropped off with J.A.M.'s family.

E.B. said she had been caring for E.J.M. for the past eighteen months, they were very bonded, E.J.M. called her "mama," and E.J.M. was very close to her half-siblings. E.B. and her husband have worked with the Department for the past six years and they are familiar with the Department's requirements, which include having a crib for E.J.M. and having only one residence where they live on a regular basis. She was concerned that E.J.M. slept on a mattress when she was with J.A.M. because E.J.M. wakes up in the middle of the night. According to E.B., if no one is watching E.J.M. in the middle of the night, she will get up, and if the house is not babyproofed, E.J.M. can get into things that might hurt her.

E.B. said her support system included her sister who is a director of the nursing department in her church and her brother whom she described as her children's favorite uncle. One of her sons is an aviation engineer for United Airlines, and his wife is a registered nurse at a children's hospital in the emergency department. She has a twenty-nine-year-old daughter who works at a staffing firm. She has a twenty-six-year-old daughter, who is a single mother with a one-year-old child.[15] She has a twenty-two-year-old daughter who has a degree in social behavioral sciences and is currently working on her second degree in safety. E.B. also knows two other foster families who will help if needed.

---

[15] The record is not entirely clear, but it appears this daughter and her child live with E.B. and J.B.

E.B. was concerned about J.A.M.'s relationship with Luisa because Luisa told her that J.A.M. hurt her and she did not want J.A.M. around E.J.M. E.B. believed J.A.M. was still communicating with Luisa because he testified that he knew where Luisa lived. Although J.A.M. testified he no longer had contact with Luisa, E.B. said Luisa and Luisa's son told her they were still in touch with J.A.M.

## 2. The foster father

J.B. testified he is a licensed paramedic[16] who provides paramedic services for a construction company and he also has a business that provides expert services to law firms. He said he is the primary contact with his and E.B.'s lawyer in the case and E.B. is the primary contact with the Department and the medical and therapy providers. He did not believe J.A.M. had changed. When asked why he believed this, he said nothing was ever investigated. He accused Kotowski of threatening him and his wife by telling them they would never be allowed to keep E.J.M., and since that time "nothing that we pointed out or observed has ever been recorded other than we asked [J.A.M.] and he said it didn't happen."[17] He also stated he knew J.A.M. was still in contact with Luisa and he believed that created a dangerous environment for E.J.M., in part because Luisa belonged to the same gang as J.A.M. He believed it was in E.J.M.'s best interest to be with his family and he did not believe she would thrive in J.A.M.'s care. He thought E.J.M.'s emotional and physical development would be hampered if placed with J.A.M. because

> [E.J.M. goes] house to house. That's always a problem. [J.A.M.] is a gang member or has been a gang member. If he's out of the gang, wonderful for him. But that doesn't mean that somebody who recognizes him from the gang won't try to deal with him. If somebody from an opposing gang sees him in the street, they

---

[16] E.B. testified J.B. is a critical care paramedic specializing in children.

[17] Kotowski was recalled as a rebuttal witness. She denied making the statement. She also stated that, in December 2020, she asked J.A.M. to contact Luisa and tell her to contact Kotowski because Kotowski was unable to reach her. She said she did not ask J.A.M. to stay away from Luisa.

won't try to deal with him. If he's got [E.J.M.] with him, I don't think they would take the time to ask him to put the child down.

So I think she would be in a dangerous spot just because of that. I don't believe he's truthful. And although I think he has potential as a young man to be something great someday [sic]. He needs to be mentored and that hasn't happened.

He described E.J.M.'s medical condition as follows:

Q. Do you have to monitor her for any signs of any kind of medical conditions, symptoms?
A. We pay attention when she eats. We pay attention when she sleeps.
Q. Why? What are you looking for?
A. She always sounds like she's breathing under water. And it's – it's concerning.
Q. Is she undergoing any current testing?
A. Yes.
Q. For what?
A. She has two things that she's doing. She – she was diagnosed as anemic. Anemia is a temporary diagnosis. It's a symptom of something else. They don't know what the something else is yet. And then, in addition, they're testing her for cystic fibrosis to make sure that the respiratory issues aren't something greater that we just haven't found out.

He believed J.A.M. had been given many chances to change, but he did not believe J.A.M. should be given another chance with E.J.M.

He knew Luisa had several children, he and his wife have adopted two of these children, and they wanted to adopt a third (E.J.M.). He said a family friend had adopted a fourth child of Luisa's. J.B. said his wife shares photographs with Luisa's two older daughters. He said he and his wife own three vehicles, including a van for all the children.

## F.     The Child Care Investigator and Daycare Worker

Two witnesses testified about E.J.M.'s alleged dairy allergy and the allegations of medical neglect against the foster parents.

### 1. The Department's child care investigator

Leslie Wilson, a residential child care investigator for the Department, testified she investigated allegations against the foster parents regarding possible neglect of E.J.M. She

explained the Department received an intake on December 9, 2021 alleging potential medical neglect of E.J.M. by her current foster parents, stating E.J.M. had gone on a visit with J.A.M. the weekend of December 3-5, 2021, and there were "some kind" of medical issues the following week. Wilson clarified the allegation was that E.J.M. previously had an allergy known to the foster parents that she was not supposed to have dairy or milk and this information was withheld from J.A.M. prior to his visit on the weekend of December 3-5, 2021. As a result, E.J.M. was given milk and cheese and she became ill.

After receiving the intake, Wilson went to E.J.M.'s daycare on December 10th to visit with E.J.M. and the daycare worker, Edelmira Horn. Wilson said Horn told her that E.J.M. had just recently begun to have issues with milk and the diarrhea had been happening for the last two weeks, which would have been one week prior to E.J.M.'s weekend visit with J.A.M. Wilson said Horn told her that she spoke to E.B. about the issues, a week before the visit with J.A.M., and Horn thought E.B. was making note of a food sensitivity. Wilson next spoke with the foster parents and a nurse in E.J.M.'s gastroenterologist's office. The nurse said they saw E.J.M. on December 9 and were not concerned. Wilson concluded E.J.M. did not lose a significant amount of weight and nothing indicated medical neglect. Because the medical records dated December 9, after E.J.M.'s visit with J.A.M., indicated E.J.M. should no longer have milk, Wilson concluded there was no indication the foster parents had withheld information prior to E.J.M.'s visit with her father. Wilson said she clarified several times with Horn the two-week timeline.

### 2. The daycare worker

Horn testified she is a childcare provider at the First Baptist Child Development Center. She said E.J.M. was in her care throughout December 2021. Her "infant daily report sheet" for December 9th did not show any notation for diarrhea and she could not recall E.J.M. having diarrhea at the time. She recalled being interviewed by Wilson but she did not recall telling Wilson

that E.J.M. had diarrhea for two weeks. She denied telling Wilson that diarrhea was an ongoing issue for E.J.M. Her notes also did not indicate E.J.M. was picked up from daycare and taken to the doctor on December 9. However, she admitted something could have happened with E.J.M. during the day when she was not present. She also admitted the notes she used to refresh her memory were sent to her by E.B.

## THE PREDICATE GROUND FOR TERMINATION

The trial court terminated J.A.M.'s parental rights based on the jury's finding that he engaged in conduct or knowingly placed E.J.M. with persons who engaged in conduct that endangered E.J.M.'s physical or emotional well-being. *See* TEX. FAM. CODE § 161.001(b)(1)(E). In the context of subsection (E), "endangerment encompasses 'more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment.'" *In re D.L.W.W.*, 617 S.W.3d 64, 78 (Tex. App.—Houston [1st Dist.] 2020, no pet.) (citation omitted). "Instead, 'endanger' means to expose the child to loss or injury or to jeopardize her emotional or physical health." *Id.* "Under subsection E, the trial court determines whether there is evidence that a parent's acts, omissions, or failures to act endangered the child's physical or emotional well-being." *In re I.I.T.*, 648 S.W.3d 467, 475 (Tex. App.—San Antonio 2021, no pet.); *see also In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.) ("Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act."). A child is endangered when the parent's course of conduct creates a potential for danger about which the parent is aware but disregards. *I.I.T.*, 648 S.W.3d at 475. "The factfinder may further consider parental conduct that did not occur in the child's presence, including conduct before the child's birth or after the child was removed from a parent's care." *Id.* "Termination under

subsection E must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent." *J.T.G.*, 121 S.W.3d at 125.

On appeal, J.A.M. asserts the evidence is legally and factually insufficient to support termination under subsection (E) because, among other things, he has taken steps to change his life in a positive manner since E.J.M.'s birth, he completed all his service plan requirements, he is compliant with the conditions of his probation and has not participated in any criminal activity since before E.J.M.'s birth, and the Department and his counselor recommend he be reunited with E.J.M. He contends there was no testimony that he engaged in any conduct that endangered E.J.M. We disagree. *J.O.A.*, 283 S.W.3d at 346 (court of appeals' analysis suggested a comparison of father's conduct over time, attributing greater weight to his recent improvements and less to his past challenges; Supreme Court stated, "[w]hile we do not question the court's logic, we do reject its use here as part of the legal sufficiency review.").

J.A.M. admitted he and Luisa procured and used methamphetamines together, but he denied getting her addicted or giving her any drugs. At the time they took methamphetamine together, he knew Luisa was pregnant with E.J.M. Endangerment can include knowledge that a child's mother abused drugs while pregnant, the father knew, and the father did not try to stop her. *See In re H.M.J.*, No. 06-18-00009-CV, 2018 WL 3028980, at *5 (Tex. App.—Texarkana June 19, 2018, no pet.) (mem. op.) (father admitted knowledge of mother's illegal drug use during her pregnancy and he was aware her drug use could have profound effects on the child's well-being, but he failed to report mother to the Department or to the police and did not ensure she received any substance abuse treatment; child was born addicted to methamphetamine and suffered physical ailments in addition to the effects of withdrawal); *In re J.W.S.*, No. 06-14-00018-CV, 2014 WL 3013352, at *6 (Tex. App.—Texarkana July 2, 2014, no pet.) (mem. op.) ("This evidence was sufficient for the trial court to find that [father] knew of [mother's] drug use during the pregnancy,

but did nothing to stop it. [Father's] omission—the failure to take any action to protect F.S. from [mother's] drug abuse—which occurred throughout [mother's] pregnancy, was both legally and factually sufficient to support the trial court's finding that [father] engaged in conduct that endangered F.S.").

In 2022, the Texas Supreme Court agreed with this proposition because "holding otherwise would effectively endorse a parent's willful ignorance of the significant risk that a pregnant mother's drug use poses, which we decline to do." *In re J.W.*, 645 S.W.3d 726, 750 (Tex. 2022). However, the *J.W.* Court did not "endorse attributing any and all known dangers posed to a child during the mother's pregnancy to the other parent." *Id.* "As is often the case in parental-termination proceedings, the inquiry is necessarily dependent on the facts and circumstances." *Id.* Here, other facts and circumstances also support the endangerment finding.

"The specific danger to the child's well-being need not be established as an independent proposition, but may be inferred from parental misconduct." *See In re B.C.S.*, 479 S.W.3d 918, 926 (Tex. App.—El Paso 2015, no pet.). Evidence of criminal conduct, convictions, and imprisonment and their effect on the parent's life and ability to parent may establish an endangering course of conduct. *Id.* An offense committed by a parent before the birth of the parent's child "can be a relevant factor in establishing an endangering course of conduct." *In re E.N.C.*, 384 S.W.3d 796, 804-05 (Tex. 2012). Here, the jury heard evidence of a January 25, 2010, burglary of a habitation with force conviction; an August 14, 2010, burglary of a habitation with force conviction; an August 28, 2013, evading arrest/detention with vehicle conviction; and a November 8, 2019, possession with intent to distribute conviction. The jury also heard evidence that J.A.M. had violated his community supervision, which resulted in his incarceration on two separate occasions. The jury could have reasonably inferred an endangering course of conduct from J.A.M.'s history of felonies and violating the terms of his community supervision.

Finally, as stated above, a child is endangered when the parent's course of conduct creates a potential for danger about which the parent is aware but disregards. *I.I.T.*, 648 S.W.3d at 475. J.A.M. admitted he was charged with assaulting Luisa while she was pregnant with E.J.M. and the charge was dismissed based on insufficient evidence after he pled guilty to the drug offense. "Domestic violence may be considered evidence of endangerment." *In re C.J.O.*, 325 S.W.3d 261, 265 (Tex. App.—Eastland 2010, pet. denied) (holding, "If a parent abuses or neglects the other parent or other children, that conduct can be used to support a finding of endangerment even against a child who was not yet born at the time of the conduct."); *see also In re R.S.-T.*, 522 S.W.3d 92, 110 (Tex. App.—San Antonio 2017, no pet.) (concluding trial court could have formed a firm belief or conviction that father endangered R.S.-T.'s physical or emotional well-being because record showed mother used drugs during her pregnancy and father was aware of her drug use; both parents acknowledged the domestic violence; when questioned by the Department, father made light of the domestic abuse, explaining things simply "got out of hand"); *In re V.V.*, 349 S.W.3d 548, 556 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) ("Texas courts routinely consider evidence of parent-on-parent physical abuse in termination cases without specifically requiring evidence that the conduct resulted in a criminal conviction.").

Viewing all the evidence in the light most favorable to the trial court's judgment, we conclude a reasonable trier of fact could have formed a firm belief or conviction J.A.M. "engaged in conduct . . . which endanger[ed] the physical or emotional well-being of [E.J.M.]." TEX. FAM. CODE § 161.001(b)(1)(E). Thus, the evidence is legally sufficient to support this finding. Further, after considering the entire record, including any disputed or contrary evidence, we conclude the evidence is factually sufficient to support the trial court's termination under subsection (E).

**THE BEST INTEREST FINDING**

On appeal, J.A.M. asserts the evidence is legally and factually insufficient to support the jury's finding that termination of his parental rights was in E.J.M.'s best interest.

When considering the best interest of the child, we recognize the existence of a strong presumption that the child's best interest is served by preserving the parent-child relationship. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam). "[T]he best interest standard does not permit termination [of parental rights] merely because a child might be better off living elsewhere." *In re A.H.*, 414 S.W.3d 802, 807 (Tex. App.—San Antonio 2013, no pet.) (citation omitted). However, we also presume that prompt and permanent placement of the child in a safe environment is in the child's best interest. TEX. FAM. CODE § 263.307(a).

The party seeking termination has the burden to rebut these presumptions by clear and convincing evidence. *See In re J.C.M.*, No. 04-22-00718-CV, 2023 WL 2520597, at *2 (Tex. App.—San Antonio Mar. 15, 2023, no pet. h.) (mem. op.). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE § 101.007. To determine whether this burden was satisfied, the Texas Legislature has provided several factors[18] for courts to consider regarding a parent's willingness and ability to provide a

---

[18] The statutory factors include: "(1) the child's age and physical and mental vulnerabilities; (2) the frequency and nature of out-of-home placements; (3) the magnitude, frequency, and circumstances of the harm to the child; (4) whether the child has been the victim of repeated harm after the initial report and intervention by the department; (5) whether the child is fearful of living in or returning to the child's home; (6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home; (7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; (8) whether there is a history of substance abuse by the child's family or others who have access to the child's home; (9) whether the perpetrator of the harm to the child is identified; (10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; (12) whether the child's family demonstrates adequate parenting skills [. . .]; and (13) whether an adequate social support system consisting of an extended family and friends is available to the child." TEX. FAM. CODE § 263.307(b).

child with a safe environment, and the Texas Supreme Court has provided a similar list of factors[19] to determine a child's best interest. TEX. FAM. CODE § 263.307(b); *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976).

A best-interest finding does not require proof of any particular factors. *See In re G.C.D.*, No. 04-14-00769-CV, 2015 WL 1938435, at *5 (Tex. App.—San Antonio Apr. 29, 2015, no pet.) (mem. op.). Neither the statutory factors nor the *Holley* factors are exhaustive, and "[e]vidence of a single factor may be sufficient for a factfinder to form a reasonable belief or conviction that termination is in the child's best interest." *In re J.B.-F.*, No. 04-18-00181-CV, 2018 WL 3551208, at *3 (Tex. App.—San Antonio July 25, 2018, pet. denied) (mem. op.); *see In re C.H.*, 89 S.W.3d at 27 (Department need not prove all nine *Holley* factors, and the absence of evidence relevant to some of those factors does not bar a finding that termination is in the child's best interest). "A trier of fact may measure a parent's future conduct by his past conduct [in] determin[ing] whether termination of parental rights is in the child's best interest." *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied). In analyzing these factors, the court must focus on the best interest of the child, not the best interest of the parent. *Dupree v. Tex. Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 86 (Tex. App.—Dallas 1995, no writ).

Evidence that proves a statutory predicate ground for termination is probative on the issue of best interest. *In re C.H.*, 89 S.W.3d at 28. Here, the predicate endangerment finding was supported by evidence of J.A.M.'s use of drugs with Luisa while she was pregnant with E.J.M., his criminal background, and the charge of assaulting Luisa while she was pregnant with E.J.M.

---

[19] The *Holley* factors include: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist those individuals to promote the best interest of the child; (6) the plans for the child by these individuals or the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley*, 544 S.W.2d at 371-72.

"We are mindful that in some cases the best interest of the child is infused with the statutory offensive behavior . . . and that there are instances where the offending behavior will demand termination of parental rights." *In re W.C.*, 98 S.W.3d 753, 765 (Tex. App.—Fort Worth 2003, no pet.). "However, we also note there are those cases where the best interest determination must have a firm basis in facts standing apart from the offending behavior." *Id.* at 765-66. "Although such behavior may reasonably suggest that a child would be better off with a new family, the best interest standard does not permit termination merely because a child might be better off living elsewhere." *Id.* at 766. We conclude "this case is one where [J.A.M.'s] offending behavior [all of which occurred before E.J.M.'s birth] is not egregious enough, *on its own*, to warrant a finding that termination is in [E.J.M.'s] best interests." *Id.* (emphasis added); *see also In re O.N.H.*, 401 S.W.3d 681, 684 (Tex. App.—San Antonio 2013, no pet.) ("mere fact that an act or omission occurred in the past does not *ipso facto* prove that termination is currently in the child's best interest"). "Accordingly, other independent facts must support the jury's best interest finding." *W.C.*, 98 S.W.3d at 766.

Of the Family Code statutory factors, the trier of fact could consider that E.J.M.'s age made her vulnerable. *See* TEX. FAM. CODE § 263.307(b)(1). The jury also heard testimony regarding E.J.M.'s medical evaluations and her continued need for therapy and medical care. *Id.* The evidence of J.A.M.'s history of felony criminal offenses, assaultive conduct, and history of substance abuse was undisputed. *Id.* § 263.307(b)(7),(8).

Although J.A.M. indicated a willingness to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision, he could not identify E.J.M.'s healthcare providers, specific daycare centers, schools, doctors, or therapists. J.A.M. stated he would research this information and place E.J.M. with the appropriate people, but he had not yet done so. *Id.* § 263.307(b)(10). He admitted he has not spoken to E.J.M.'s doctors

or therapists, and he had not spoken to the foster mother about E.J.M.'s medical care. Although J.A.M. testified he had a support system with his mother, sister, and brother-in-law, no evidence was adduced about the type of assistance they would provide except that his mother would look after E.J.M. *Id.* § 263.307(b)(13).

Under *Holley*, E.J.M. is too young to express her desires. When a child is too young to express her desires, the factfinder may consider whether the child has bonded with her caregivers, is well-cared for by them, and whether the child has spent minimal time with a parent. *See In re S.J.R.-Z.*, 537 S.W.3d 677, 693 (Tex. App.—San Antonio 2017, pet. denied). At the time of trial, E.J.M. was about eighteen months old and had been with the foster parents since her birth. The evidence is undisputed that E.J.M. is well cared for by the foster parents. The foster parents and J.A.M. all testified they are bonded with E.J.M. and that she was bonded with their respective extended families.

Evidence as to the other *Holley* factors also supports the trial court's best-interest finding. There was no evidence about E.J.M.'s emotional needs now or in the future. However, her physical needs now and possibly into the future appear to be significant. Although J.A.M. could likely provide for E.J.M.'s emotional needs, the jury could infer that he would be unable to provide for her physical needs based on his failure to identify her current providers and his failure to communicate with her doctors or foster parents about E.J.M.'s medical needs. The jury could also infer an inability on J.A.M.'s part to provide for E.J.M.'s needs now or in the future because he is currently on probation and has a history of reoffending. *See In re A.R.*, No. 06-22-00065-CV, 2023 WL 1769269, at *13 (Tex. App.—Texarkana Feb. 6, 2023, no pet. h.) (mem. op.) (holding that although father could provide for children's physical needs, jury could infer he would be unable to provide for children's emotional needs based, in part, on his pending criminal charges).

Evidence that a parent is "economically disadvantaged" "does not constitute clear and convincing evidence sufficient for a court to . . . order termination of the parent-child relationship." TEX. FAM. CODE § 161.001(c)(2). However, the disparity between J.A.M.'s economic status and the foster parents' economic status aside, the foster parents' parental abilities, their knowledge of E.J.M.'s medical and therapeutic needs, and the stability of their home is undisputed.

Having reviewed the evidence in the record in the light most favorable to the jury's finding, as we must when conducting a legal sufficiency review, we conclude the fact-finder could have formed a firm belief or conviction that termination of J.A.M.'s parental rights was in E.J.M.'s best interest.

We begin our analysis of the factual sufficiency of the evidence by noting J.A.M. showed improvement during the pendency of the case and several witnesses, including Department caseworkers, supported him reuniting with E.J.M. However, "[w]hile the recent improvements made by [J.A.M.] are significant, evidence of improved conduct, especially of short-duration, does not conclusively negate the probative value of a long history of drug use and irresponsible choices." *J.O.A.*, 283 S.W.3d at 346. Here, we cannot say that the contrary evidence of recent improvement is "so significant" that the factfinder could not have formed a firm belief or conviction that termination of J.A.M.'s parental rights was in E.J.M.'s best interest.

J.A.M. has successfully completed the requirements of his service plan, which would assist him promoting E.J.M.'s best interest. He knew E.J.M. qualified for Medicaid but he did not know the procedure for renewing Medicaid. Kotowski testified J.A.M. "really loved" E.J.M.; he tried to care for her every need; whenever she was upset, he would check all the basics such as her diaper and whether she was hungry; and he would walk her around and do everything he could to soothe her. He also brought E.J.M. food, gifts, and toys. The record also indicates E.J.M. is cared for by J.A.M. when she is with him.

However, J.A.M. does not currently have stability in his home. He lives with his mother but plans to live with Jennifer if E.J.M. is placed with him. There was little evidence about Jennifer's home except that the Department had conducted a satisfactory home study and she had a spare bedroom with a crib for E.J.M. J.A.M. gave no specifics beyond that his extended family will help him care for E.J.M. *See J.M. v. Tex. Dep't of Family & Prot. Servs.*, No. 03-22-00435-CV, 2023 WL 213928, at *8 (Tex. App.—Austin Jan. 17, 2023, no pet. h.) (mem. op.) (self-serving "hypothetical" does not constitute evidence of concrete plans). Furthermore, he does not own his own vehicle, he uses his mother's car when he goes to work, and the record does not indicate what transportation will be available to him if he moves in with Jennifer.

J.A.M. offered no excuse for his criminal behavior. *See In re E.B.*, No. 02-22-00205-CV, 2022 WL 17172340, at *10 (Tex. App.—Fort Worth Nov. 23, 2022, no pet.) (mem. op.) ("While Mother acknowledges responsibility for her incarceration, it is difficult to excuse Mother for her failings based on her incarceration when that incarceration was because of her own choices."); *In re L.N.C.*, 573 S.W.3d 309, 319 (Tex. App.—Houston [14th Dist.] 2019, pet. denied) ("Father did not appear at trial or participate by any other means. The record is therefore silent as to any excuse for his acts or omissions. The trial court was entitled to find that this factor weighed neither for nor against terminating Father's parental rights"). J.A.M. agreed four felonies was "a lot," but he said he did not intend to reoffend because going through the system was "getting old" and he now realized he needed to take responsibility and gain stability. However, the jury as factfinder could have disbelieved his testimony and determined he was not credible. *See J.O.A.*, 283 S.W.3d at 346 (explaining factfinder is sole judge of credibility and weight of the evidence).

Considering all the other evidence presented, we conclude the evidence is factually sufficient to support the jury's finding that termination of J.A.M.'s parental rights was in E.J.M.'s best interest.

**CONCLUSION**

We overrule J.A.M.'s issues on appeal and affirm the trial court's Final Order in Suit Affecting the Parent-Child Relationship and Order of Termination.

Lori I. Valenzuela, Justice